Nona B. Wood v. Commissioner. Owen A. Wood v. Commissioner. Owen A. Wood and Nona B. Wood v. Commissioner.
Wood v. Commissioner
Docket Nos. 34868-34870.
United States Tax Court
T.C. Memo 1955-301; 1955 Tax Ct. Memo LEXIS 36; 14 T.C.M. (CCH) 1156; T.C.M. (RIA) 55301; November 7, 1955
Douglas W. McGregor, Esq., for the petitioners. M. Clifton Maxwell, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion These consolidated proceedings involve income tax deficiencies and negligence penalties of the petitioners as follows: Petitioner
Year
Deficiency
Penalty
Nona B. Wood
1945
$13,597.44
$ 679.87
1946
39,876.34
1,993.82
1947
11,243.11
562.16
Owen A. Wood
1945
13,597.44
679.87
1946
39,876.34
1,993.82
1947
11,243.11
562.16
Owen A. Wood and Nona B. Wood
1948
4,359.66
217.98
1949
3,125.04
156.25
*37 The issues presented are (1) whether the respondent's action in changing petitioners' method of reporting income was unreasonable and arbitrary; (2) whether the five-year period of limitations provided by section 275(c) of the 1939 Code is applicable with respect to the taxable years 1945 and 1946; (3) whether the amounts expended for maintenance of roads are properly capitalizable as development cost of property sold; and (4) whether the negligence penalty under section 293(a) is properly imposed for intentional disregard of respondent's rules and regulations. The respondent concedes error as to the issue respecting the disallowance of the sum of $3,000 paid to petitioners' son in the year 1947 as a bonus. Findings of Fact The stipulated facts are found accordingly. Petitioners are husband and wife and have been married approximately 50 years. They have resided in Houston, Texas, for 21 years. Petitioners, for the calendar years 1945 to 1947, inclusive, reported community income on individual income tax returns (Form 1040) and on joint returns for the years 1948 and 1949. The returns for the taxable years involved were filed with the collector of internal revenue for the *38 first district of Texas. Owen A. Wood has been engaged in real estate promotions in Texas for 40 years. In 1943, and subsequently, the petitioners purchase property in Florida with community funds accumulated since marriage. Petitioners advertised property for sale and upon inquiry forwarded advertising matter along with a purchase order form to be filled in by the prospective purchaser. The advertising matter was signed by Owen A. Wood and directed the order and remittance to be sent to him at Box 873, Houston, Texas. Upon the receipt of a purchase order with a remittance a sales agreement and contract for deed was issued to the purchaser. Typical of the agreements issued is the following: "KNOW ALL MEN BY THESE PRESENTS: "This Contract and Agreement made and executed by OWEN A. WOOD, TRUSTEE, hereinafter called Seller, and for of hereinafter called PURCHASER. "WITNESSETH: - That the said OWEN A. WOOD, TRUSTEE-SELLER - hereby agrees to sell, and the said PURCHASER has agreed to buy, for the sum of Dollars ( $ ) the following Property or Properties, lying and being in Bay County, Florida and more definitely described as being situated in the Town of GREEN HILLS, according *39 to the Official Plat thereof as it appears in the Public Records of Bay County, Florida in Plat Book No. 3 at Page 14 thereof, the particular Property or Properties being described herein, are as follows: - [Description] "CONSIDERATION: - The Purchaser has paid to the Seller the sum of $ as part payment thereon, the receipt of which is hereby acknowledged, and Purchaser agrees to pay the balance of $ to the Seller at his Office in Houston, Texas, or mail to him at Post Office Box 873, Houston, Texas; as follows: - The sum of $ shall be paid on the day of , 194 and a like sum of $ shall be paid on the day of each and every month thereafter, in regular monthly installments, until the entire balance of said consideration is fully paid. The unpaid balance of the Purchase Price, or any part thereof, may be paid at any time before due, by the Purchaser. "As soon as said balance is fully paid, SELLER hereby agrees to promptly deliver to the said PURCHASER a good and sufficient Warranty Deed to the above described Property or Properties, in accordance with and subject to the following provisions and conditions - "1 - The Purchaser is hereby requested and urged to make a personal *40 inspection of said Property or Properties, as soon as possible, the quicker the better. Should such inspection be made within four (4) months from date, if said Purchaser is not altogether pleased with said property or properties - Purchaser may then select any unsold Town Lots in Green Hills and purchase same at the price which such Property is then being offered. In that event all payments previously made by Purchaser shall be applied on the purchase price of the substituted Property, in lieu of the Property originally selected and a new Contract For Deed shall be delivered to Purchaser covering the said substituted Property. "2 - The Warranty Deed delivered to said Purchaser shall cover, convey and include all of the Oil and Gas Royalty Rights, together with all Royalty Rights to any and all other Minerals that may ever be found in or under the said Property or Properties conveyed in said Deed. "3 - Subject to the present existing Oil and Gas Mineral Exploratory and Development Lease on said property or properties, executed for a primary term of Ten (10) Years and as long thereafter as oil and gas or either, is produced in paying quantities on said property or properties. *41 "4 - All Taxes shall be paid by the Seller that are due prior to the Execution of Deed to Purchaser. "5 - Purchaser promises and agrees to pay all monthly installments promptly when due, but in case of default, Seller may at his option terminate this Contract and all payments made thereon, amounting to Twenty-five Dollars ( $25) or less, shall be forfeited by Purchaser and retained by Seller as compensation for services rendered and in payment for Purchaser's option held on said Property. If more than $25 has been paid thereon, then the entire amount shall be credited on the purchase price of Town Lots in GREEN HILLS, to be selected by Seller and conveyed to Purchaser when payment is completed thereon. "6 - Purchaser may make payments in advance at any time, or may pay up the balance due ahead of time and promptly receive Deed. "7 - No sales are made to colored people. The use, occupancy and ownership of our Winter Garden Farms and Green Hills Lots are restricted solely to members of the White Race. "IN WITNESS WHEREOF - The said Seller has hereunto Affixed his Signature at Houston, Harris County, Texas, on this the Day of , 194. A.D." Other forms listed Owen A. Wood as *42 the owner and seller. Upon the payment of the full consideration a warranty deed was delivered to the purchaser. During the year 1945 and prior thereto the petitioners' records were kept on cards by secretaries. Gross profits were reported on the "deed" basis, accumulating the costs and reporting the profit after all payments had been received and the deed delivered. In April or May 1946 an accountant installed a system of control accounts to reflect the data shown on the cards. Under the system, upon the receipt of a purchase order the contract receivable account was debited and the deferred gross profit account was credited. The cost basis of the lot being sold was transferred from the land investment account and charged to the deferred gross profit account. When all the payments had been received the deferred gross profit was transferred to current profit and reported in income. The accountant described the petitioners' method of reporting as the completed contract basis. Prior to the receipt of all payments on a contract the card was carried in the incomplete contract file. After all payments had been received the card was transferred to the completed contract file. If *43 the contract was cancelled the card was transferred to the cancelled contract file. In some instances refunds were made upon the cancellation of the contract; in many instances the payments were retained. The report of the revenue agent examining the returns of petitioners was adopted by the respondent, and became the basis for the determination of the deficiencies. For the year 1945 the revenue agent scheduled the cards representing contracts which were incomplete in that year, including amounts received on such contracts in prior years. Against these receipts he offset the cost, appearing on the cards, of the tracts for which payments were being made. In each instance the down payment exceeded the cost of the tract sold. In addition, the agent scheduled the amounts received in 1945 on contracts subsequently cancelled, deducting therefrom the amount of refunds made to purchasers. The sum of the above adjustments was added to the income reported in 1945. The following summary reflects the results of the agent's adjustments for the taxable year 1945: Cash received in 1945 on incomplete contracts
$58,343.15
Cash received prior to 1945 on incomplete contracts
1,270.00
$59,613.15
Land cost on which above payments were received
22,082.85
$ 37,530.30
Cash received in 1945 on cancelled contracts
$15,181.10
Refunds applicable to 1945
2,367.00
12,814.10
Additional gross profit 1945
50,344.40
1945 gross profit reported
57,221.70
Corrected 1945 gross profit
$107,566.10
*44 For the taxable years 1946 to 1949, inclusive, the agent used the control accounts. He determined the cash received on active contracts each year by analyzing the credit to the contracts receivable account, eliminating credits from sources other than cash. Also eliminated were cancelled contracts, returned checks, and refunds actually made. Against cash received on active contracts each year, the cost basis of the contract entered into each year was deducted. The cost was arrived at by an analysis of the land account. The following summary reflects the results of the agent's adjustments for the taxable years 1946 to 1949, inclusive: 1946
1947
1948
1949
Contracts receivable credit
$304,391.95
$235,432.24
$194,156.62
$155,685.91
Reductions: Cancelled contracts
80,614.83
77,271.43
49,639.34
45,466.20
Returned checks
626.00
1,171.00
1,643.00
660.00
Refunds paid
8,782.20
2,449.00
4,507.00
3,558.85
Total reductions
$ 90,023.03
$ 80,891.43
$ 55,789.34
$ 49,685.05
Net cash received
$214,368.92
$154,540.81
$138,367.28
$106,000.86
Cost of land
17,230.05
10,251.27
9,746.33
10,687.61
Corrected gross profit
$197,138.87
$144,289.54
$128,620.95
$ 95,313.25
Gross profit reported
98,797.58
145,476.15
168,936.05
108,281.22
Addition (reduction) in gross profit
$ 98,341.29
($ 1,186.61)
($ 40,315.10)
($ 12,967.97)
*45 The deficiency notice for each of the taxable years contained the following explanatory paragraph: "As a dealer in real estate, you have reported on the completed contract basis and have deferred the transfer of title until all payments have been made, retaining in most cases payments made on contracts which were defaulted. Therefore, the cash received on purchases in excess of cost of property sold is income in the year received and the amounts received on cancelled contracts (less refunds, if any) is income in the year received. Therefore, income reported has been adjusted * * *." The following summary reflects the community gross income reported by petitioners, the amount determined by the respondent to be properly includable, and the amount omitted for the taxable years 1945 and 1946: Community
gross
Determined by
Amount
Year
income reported
respondent
omitted
1945
$57,221.70
$107,566.10
$50,344.40
1946
98,797.58
197,138.87
98,341.29
The amount of community gross income omitted was in excess of 25 per cent of the amount stated on petitioners' returns for 1945 and 1946. The income tax returns of petitioners were filed on March 15, 1946, and *46 February 24, 1947, respectively. The notice of deficiency for the years 1945 and 1946 was issued on March 12, 1951. The farm lots sold by petitioners were scattered throughout the development. There was no agreement with purchasers of lots obligating petitioners to maintain the roads. The contract for deeds provided for an exception of a 25-foot easement for roads and such a reservation was contained in the deed. In the taxable years involved petitioners expensed certain amounts disbursed for operation of a grader or scraper and cleaning our culverts filled with sand washed from the roads. For the past two years the county has been maintaining the roads for owners of tracts who have built thereon. The respondent determined that the amounts expended for road maintenance were a part of the development cost and are capital items. The revenue agent examining the 1944 returns of petitioners restored to income certain capital items claimed as expense. The petitioners accepted such adjustments. Because throughout the taxable years 1945 to 1949, inclusive, petitioners continued to treat certain expenditures for road maintenance as expense rather than as capital items, the respondent imposed *47 a negligence penalty under section 293(a) of the Code for intentional disregard of rules and regulations for each of the taxable years in question. The method of accounting regularly employed by the petitioners during the taxable years 1945 to 1949, inclusive, does not correctly reflect income. The petitioners have not sustained the burden of establishing that the method of accounting used by the respondent was unreasonable and arbitrary and does not clearly reflect income. The amount of community gross income omitted by the petitioners from their returns in each of the taxable years 1945 and 1946 was in excess of 25 per cent of the amount of community gross income, properly includable therein. The deficiencies determined for the years 1945 and 1946 are not barred. The amounts stipulated as expenditures for road maintenance are a part of the land development cost, constituting capital and not expense items. No part of the deficiency for each of the taxable years is due to an intentional disregard of rules and regulations. Opinion LEMIRE, Judge: The first question presented involves the propriety of the respondent's action in changing the method regularly employed by the *48 petitioners in reporting their income. The petitioners were engaged in selling lots under a written contract providing for the delivery of a deed upon the completion of the payment of the agreed consideration. The purchaser had the option to pay all of the consideration at once or by monthly installments. The gain resulting was reported as income in the year the deed was delivered. Petitioners' method was described by their accountant as the completed contract basis. The petitioners contend that their method of reporting clearly reflects their correct income; that it has been in use for prior years without objection by the respondent; and that the method of accounting employed by the respondent is unauthorized and arbitrary. The respondent contends that the amount received from the land sales in excess of the basis was taxable upon receipt, where petitioners were under no obligation to return the payments upon default of the purchaser. Petitioners do not challenge the correctness of the amounts determined by the respondent, if it is held that the method of accounting employed by them does not correctly reflect their taxable income. Section 41 of the Internal Revenue Code *49 (1939) provides in substance that net income shall be computed in accordance with the method of accounting regularly employed, but if the method employed does not clearly reflect the income the computation shall be made in accordance with such method as, in the opinion of the Commissioner, does clearly reflect the income. The statute gives the Commissioner a broad discretion. His selection of such a method may be challenged only upon a clear showing that he has abused his discretion. Brown v. Helvering, 291 U.S. 193; Standard Paving Co. v. Commissioner, 190 Fed. (2d) 330, certiorari denied 342 U.S. 860, affirming 13 T.C. 425. Treasury Regulations accord special treatment of certain types of long-term contracts which are defined to mean building, installation or construction contracts covering a period in excess of one year from the date of the execution of the contract to the date the contract is finally completed and accepted. Regs. 111, sec. 29.42-4. The contracts here in question do not qualify for such special treatment and the adoption of such method by the petitioners is unauthorized and does not correctly reflect true *50 income. John W. Commons, 20 T.C. 900. The petitioners contend that they have used the same accounting method for many years without challenge by the Commissioner and that a method so consistently followed should not be changed. The method of accounting employed by a taxpayer is never conclusive. The query always is whether the method used correctly reflects income. John W. Commons, supra. The petitioners further argue that until the delivery of the deed the contract was executory and contingent since the petitioners permitted cancellation of the contracts and refunded the payments made when it was possible to locate such purchasers. We are not impressed with that argument. We find no legal obligation upon the petitioners to make any refund. In fact, the typical contract for deed set forth in our findings of fact evidences the contrary. The deferred payments were received without restriction and petitioners' right to use the proceeds was absolute. The case of Veenstra & DeHaan Coal Co., 11 T.C. 964, upon which petitioners rely, is clearly distinguishable from the instant proceeding and is not controlling. The established rule is that *51 under a simple land contract where, as here, the obligation of the purchaser to make the remaining payments has no market value the amounts received in excess of the cost basis of the land sold constitute income in the year of receipt. Birdneck Realty Corp., 25 B.T.A. 1084; Max Viault, 36 B.T.A. 430; Estate of Clarence W. Ennis, 23 T.C. 799. Cf. Harold W. Johnston, 14 T.C. 560. The method of accounting adopted by the respondent recognizes the above rule, and his action in changing the unauthorized method employed by petitioners was neither arbitrary nor an unreasonable exercise of his discretion. The second question presented is whether the deficiencies determined for the years 1945 and 1946 are barred. The notice of deficiency was issued on March 12, 1951, within a period of five years from the date the respective returns were filed. The record establishes that the petitioners' community gross income for the taxable years 1945 and 1946 as determined by the respondent and properly includable in income is more than 25 per cent greater than that reported. Therefore, the respondent has carried his burden of showing that the five-year *52 period of limitations provided by section 275(c) of the Code is applicable and the proposed assessment for such years is not barred. The third question is whether certain amounts expended for maintenance of roads are properly capitalizable as development costs of the property sold or may be charged off as an expense. The issue is one of fact. The amounts involved have been stipulated. They cover such items as operating a grader and cleaning out culverts. Petitioners were engaged in selling vacant lots in a large development. The sales were not confined to any one locality but were scattered throughout the development. The seller agreed to furnish each purchaser a road by his tract but was under no obligation to maintain the road. Petitioners used the roads to facilitate the making of new sales and to afford ingress and egress to the tracts. Petitioners received no rental income from the lots sold or the remaining tracts. The respondent contends that such expenses are properly capitalizable as development costs pertaining to the sale of remaining lots. We agree. We think it obvious that the expenditures were not incurred in the operation of petitioners' trade or business within *53 the purview of section 23(a)(1)(A) of the Code, as contended by petitioners. Nor do they constitute nonbusiness expenses under section 23(a)(2) since they were not incurred for the production or collection of income, or for the management, conservation or maintenance of property held for the production of income. We think such expenditures increase the capital value of the land and should be apportioned as a part of the adjusted basis of the lots being sold. Petitioners have not shown that the respondent's treatment of such expenditures as capital items is erroneous, and his determination is sustained. The final issue involves the propriety of the imposition of the negligence penalty under section 293(a) of the Code, for the intentional disregard of rules and regulations. The revenue agent examining petitioners' returns for 1944 treated certain maintenance items as capital expenditures rather than expenses. The petitioners accepted the agent's adjustments. The agent's report was dated June 14, 1945, and respondent argues that because petitioners thereafter continued to expense certain road maintenance items an intentional disregard of rules and regulations is shown. On cross-examination *54 the revenue agent first testified that he recommended the negligence penalty for the taxable years involved for the reason that petitioners had agreed to the revenue agent's report for the year 1944, in which a negligence penalty was proposed. When shown the report he conceded no negligence penalty was involved. He then gave as a reason the acceptance of the agent's report disallowing certain maintenance items as an expense. We do not think a mere failure to contest expense claims in one year bars a taxpayer from asserting similar claims in a subsequent year. On the record, we are convinced no intentional disregard of rules and regulations has been shown. The negligence penalty for each of the taxable years in question is disallowed. Effect will be given to the issues covered by stipulation and to the respondent's concession on brief. Decisions will be entered under Rule 50.